FILED
14-0974
8/20/2015 7:48:04 PM
tex-6592054
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

No. 14-0974

---

# IN THE SUPREME COURT OF TEXAS

---

**Eric Yollick,**
*Petitioner,*

**v.**

**JJJJ Walker, LLC, Dynafab USA, LLC, Renaissance Properties of Texas, LLC, Priya Properties, LLC, BD Texas, LLC, and KW Hospital Acquisition, LLC,**
*Respondents*.

_____

On Review from the
Fourteenth Court of Appeals, Houston, Texas
No. 14-13-00161-CV

_____

**RESPONDENTS' BRIEF ON THE MERITS**

_____

Marc S. Tabolsky
State Bar No. 24037576
mtabolsky@yettercoleman.com
Dori Kornfeld Goldman
State Bar No. 24041274
dgoldman@yettercoleman.com
YETTER COLEMAN LLP
909 Fannin Street, Suite 3600
Houston, Texas 77010
Tel. 713-632-8000
Fax 713-632-8002

ATTORNEYS FOR RESPONDENTS

R. Michael McCauley Jr.
State Bar No. 00797030
Timothy T. Pridmore
State Bar No. 00788224
MCWHORTER, COBB & JOHNSON, L.L.P.
1722 Broadway
Lubbock, Texas 79408
Tel. 806-762-0214
Fax 806-762-8014

Zona Jones
State Bar No. 10887600
PROVOST UMPHREY LAW FIRM, LLP
P.O. Box 4905
Beaumont, Texas 77704
Tel. 409-835-6000
Fax 409-813-8618

Patrick Zummo
State Bar No. 22293450
LAW OFFICES OF PATRICK ZUMMO
909 Fannin, Suite 3500
Houston, Texas 77010
Tel. 713-651-0590
Fax 713-651-0597

## IDENTITY OF PARTIES AND COUNSEL

**JJJJ Walker, LLC, Dynafab USA, LLC, Renaissance Properties of Texas, LLC, Priya Properties, LLC, BD Texas, LLC, and KW Hospital Acquisition, LLC**

**Plaintiff-Appellants**

Marc S. Tabolsky
Dori Kornfeld Goldman
YETTER COLEMAN LLP
909 Fannin Street, Suite 3600
Houston, Texas 77010
Tel. 713-632-8000
Fax 713-632-8002

R. Michael McCauley Jr.
Timothy T. Pridmore
Andrew R. Seger
MCWHORTER, COBB & JOHNSON,
  L.L.P.
1722 Broadway
Lubbock, Texas 79408
Tel. 806-762-0214
Fax 806-762-8014

Zona Jones
PROVOST UMPHREY LAW FIRM, LLP
P.O. Box 4905
Beaumont, Texas 77704
Tel. 409-835-6000
Fax 409-813-8618

Patrick Zummo
LAW OFFICES OF PATRICK ZUMMO
3900 Essex Lane, Suite 800
Houston, Texas 77027
Tel. 713-651-0590
Fax 713-651-0597

Trial and Appellate Counsel

**Eric Yollick**                                        **Defendant-Appellee**

Kristin Bays                                            Trial and Appellate Counsel
J. Randal Bays
BAYS & BAYS
1503 Hailey
Conroe, Texas 77301
Tel. 936-760-7670
Fax 936-760-7671

Roger D. Townsend
Jennifer R. Josephson
ALEXANDER DUBOSE JEFFERSON
   & TOWNSEND LLP
1844 Harvard Street
Houston, Texas 77008
Tel. 713-523-2358
Fax 713-522-4553

Eric Yollick                                            Trial Counsel
State Bar No. 22160100
Post Office Box 7571
The Woodlands, Texas 77387-7571
Tel. 281-363-3591
Fax 281-363-0488

**PAGE**

Identity of Parties and Counsel ......................................................................3

Index of Authorities ......................................................................................7

Statement of the Case..................................................................................11

Statement of Jurisdiction.............................................................................12

Issues Presented ..........................................................................................13

Introduction ................................................................................................14

Statement of Facts .......................................................................................17

Summary of Argument.................................................................................42

Argument.....................................................................................................44

I. THE AFFIRMATIVE DEFENSE OF ATTORNEY IMMUNITY IS NOT BEFORE THE COURT AND DOES NOT ABSOLVE YOLLICK OF HIS FRAUD....................44

    A. Yollick Waived Review Of Attorney Immunity By Failing To Raise The Issue In His Petition For Review. ............................................... 44

    B. Even If The Issue Of Attorney Immunity Were Before The Court, It Would Not Absolve Yollick Of His Fraud. ...................................... 47

        1. Yollick did not conclusively establish the affirmative defense of attorney immunity. .................................................... 47

        2. Attorney immunity does not apply to Yollick's fraudulent conduct. .................................................................. 48

II. THE COURT OF APPEALS CORRECTLY HELD THAT SUFFICIENT EVIDENCE SUPPORTED THE JURY'S VERDICT FINDING YOLLICK LIABLE FOR FRAUD. ...........................................................................................52

    A. Corporate Agents Are Individually Liable For Fraudulent Acts Committed In The Service Of Their Principal.................................. 53

B. There Is Overwhelming Evidence Supporting The Jury's Fraud Finding Against Yollick. ................................................................. 57

    1. Yollick made false material representations. ........................... 58

    2. Yollick knew FNB had no intention of honoring the representations he made on its behalf. ..................................... 60

    3. Investors relied on the misrepresentations. ............................ 66

III. YOLLICK'S DAMAGES ARGUMENT BEFORE THIS COURT WAS BARELY MENTIONED BY YOLLICK IN THE COURT OF APPEALS AND IS INCORRECT BECAUSE THERE IS AMPLE EVIDENCE OF INVESTOR'S DAMAGES. .................69

A. The Court Should Not Grant Yollick's Petition to Review His Damages Argument. ........................................................................ 69

B. The Court of Appeals Correctly Held That There Was Sufficient Evidence of Investor's Damages. ..................................................... 71

IV. THERE IS LEGALLY SUFFICIENT EVIDENCE TO SUPPORT THE PUNITIVE DAMAGES AWARD. .......................................................................77

Conclusion and Prayer ...........................................................................79

Certificate of Compliance Under Appellate Rule 9.4 ............................81

Certificate of Service ..............................................................................82

**Cases**

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*,
297 S.W.3d 768 (Tex. 2009) ........................................................................58, 61

*Barclay v. Johnson*,
686 S.W.2d 334 (Tex. App.—Houston [1st Dist.] 1985, no writ) .........53, 59, 60

*Bennett v. Reynolds*,
315 S.W.3d 867 (Tex. 2010) ................................................................................79

*Bright v. Addison*,
171 S.W.3d 588 (Tex. App.—Dallas 2005, pet. denied)......................................79

*Cantey Hanger v. Byrd*,
— S.W.3d —, 2015 WL 3976267 (Tex. 2015) ............................................48, 50

*Chu v. Hong*,
249 S.W.3d 441 (Tex. 2008) ........................................................................54, 55

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ................................................................................57

*Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*,
823 S.W.2d 591 (Tex. 1992) ................................................................................58

*Del Lago Partners, Inc. v. Smith*,
307 S.W.3d 762 (Tex. 2010) ................................................................................44

*DeSantis v. Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990) ................................................................................52

*Duval County Ranch Co. v. Wooldridge*,
667 S.W.2d 887 (Tex. App.—Austin 1984, writ dismissed w.o.j.) ...................60

*Essex Crane Rental Corp. v. Carter*,
371 S.W.3d 366 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) .........49, 54

*Estate of Stonecipher v. Estate of Butts*,
   686 S.W.2d 101 (Tex. 1985) ...............................................................49

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,
   960 S.W.2d 41 (Tex. 1998).................................................................57

*Fortune Prod. Co. v. Conoco, Inc.*,
   52 S.W.3d 671 (Tex. 2000)................................................................67

*Holberg v. Teal Constr. Co.*,
   879 S.W.2d 358 (Tex. App.—Houston [14th Dist.] 1994, no writ)...................53

*Holt Atherton Indus., Inc. v. Heine*,
   835 S.W.2d 80 (Tex. 1992)................................................................77

*Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*,
   443 S.W.3d 820 (Tex. 2014) .............................................................73

*James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*,
   403 S.W.3d 360 (Tex. App.—Houston [1st Dist.] 2013, no pet.)......................79

*James v. Easton*,
   368 S.W.3d 799 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).......46, 48

*JJJJ Walker, LLC v. Yollick*,
   447 S.W.3d 453 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) .........*passim*

*Liberty Sign Co. v. Arendale*,
   433 S.W.2d 23 (Tex. Civ. App.—Fort Worth 1968, no writ) ...........................71

*Likover v. Sunflower Terrace II, Ltd.*,
   696 S.W.2d 468 (Tex. App.—Houston [1st Dist.] 1985, no writ) ...............49, 50

*McKnight v. Riddle & Brown, P.C.*,
   877 S.W.2d 59 (Tex. App.—Tyler 1994, writ denied)....................................50

*Mendoza v. Fleming*,
   41 S.W.3d 781 (Tex. App.—Corpus Christi 2001, no pet.) .............................47

*Miller v. Keyser*,
   90 S.W.3d 712 (Tex. 2002)........................................................13, 54, 56, 57

*Moore v. Altra Energy Technologies, Inc.*,
  321 S.W.3d 727 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).......57, 67

*Poole v. Houston & T.C. Ry. Co.*,
  58 Tex. 134 (1882)................................................................................48, 50

*Ramos v. Richardson*,
  228 S.W.3d 672 (Tex. 2007) ...............................................................44

*Romero v. KPH Consolidation, Inc.*,
  166 S.W.3d 212 (Tex. 2005) ...............................................................71

*Southwestern Bell Telephone Co. v. Marketing on Hold Inc.*,
  308 S.W.3d 909 (Tex. 2010) ...........................................................68, 69

*Spoljaric v. Percival Tours, Inc.*,
  708 S.W.2d 432 (Tex. 1986) ...............................................................61

*Tony Gullo Motors I, L.P. v. Chapa*,
  212 S.W.3d 299 (Tex. 2006) ...............................................................58

*Trenholm v. Ratcliff*,
  646 S.W.2d 927 (Tex. 1983) ...............................................................66

*Whitney Nat'l Bank v. Baker*,
  122 S.W.3d 204 (Tex. App.—Houston [1st Dist.] 2003, no pet.)......................47

*Wright v. Sage Eng'g, Inc.*,
  137 S.W.3d 238 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) ...............53

## Statutes & Rules

TEX. CIV. PRAC. & REM. CODE §41.001(7)...........................................................78

TEX. GOV'T CODE §22.001(a)(6)...........................................................70

TEX. R. APP. P. 53.2(f) ...............................................................44, 45

TEX. R. APP. P. 55.2(f) ...............................................................44, 45

## Other Authorities

RESTATEMENT (SECOND) OF AGENCY §348 (1958) .................................................56

## STATEMENT OF THE CASE

*Nature of the Case:*     JJJJ Walker, LLC; Dynafab USA, LLC; Renaissance Properties of Texas, LLC; Priya Properties, LLC; BD Texas, LLC; and KW Hospital Acquisition, LLC sued First National Bank, its agent Eric Yollick ("Yollick"), and Merensky Reef Hospital Corporation ("Merensky Reef") for fraud, breach of fiduciary duty, conversion, and other claims arising out of the defendants' wrongful and tortious conduct related to a loan involving the purchase of three hospitals worth over $50 million. The bank and its agents, through their tortious acts, wrongfully seized the plaintiffs' respective ownership interests in Louisiana Texas Healthcare Management, LLC, which owned the hospitals, and then sold off the hospitals.

*Trial Court:*     The 281st Judicial District Court for Harris County, Texas. The Honorable Sylvia Matthews, presiding.

*Trial Court's Disposition:*     The jury returned a unanimous verdict in favor of all of the plaintiffs on their claims against First National Bank, Merensky Reef, and Yollick. CR.605-656. The jury awarded the plaintiffs over $19 million in compensatory damages and $57 million in punitive damages. CR.611, 648-655. The jury also awarded over $42 million in profit disgorgement against FNB and Merensky Reef based on FNB's breach of fiduciary duty. CR.616. With respect to Yollick, the jury found that he was responsible for 10% of each plaintiff's harm and that he should pay $5.7 million in punitive damages to plaintiffs. CR.610-611, 631-636, 650. Based on the jury's verdict and after applying the statutory cap on punitive damages, the district court entered

10

judgment against First National Bank and Merensky Reef and in favor of the plaintiffs. CR.1262-1319. The court, however, granted judgment notwithstanding the verdict with respect to plaintiffs' claims against Yollick on the ground that there was no evidence to support the liability findings against Yollick and entered judgment that plaintiffs take nothing on their claims against Yollick. CR.1260, 1265.[1]

*Court of Appeals:*  Court of Appeals for the Fourteenth Judicial District Court, Houston, Texas.

*Court of Appeals Disposition:*  On September 25, 2014, the court of appeals reversed and remanded for rendition of judgment in favor of respondents

*Court of Appeals Justices:*  Justice Christopher wrote the opinion of the court of appeals; Justices Boyce and Brown joined.

*Court of Appeals opinion:*  *JJJJ Walker, LLC v. Yollick*, 447 S.W.3d 453 (Tex. App.—Houston [14th Dist.] 2014, pet. filed).

---

[1] After the district court entered final judgment, Investors settled with First National Bank and Merensky Reef. CR.1358-59.

**STATEMENT OF JURISDICTION**

No jurisdiction exists under Texas Government Code §22.001(a)(6). The case presents no issue of importance to Texas jurisprudence and the court of appeals did not commit any error of law. Other than Yollick's argument that he is immune from liability for committing fraud—in a scheme in which he made false statements, set up shell entities that he and his wife (who used a pseudonym) controlled, and had his client pay his wife thousands of dollars for reasons that no one could explain or justify—based on an affirmative defense that he did not ask to have submitted to the jury and that was not raised in his petition for review, his brief presents nothing more than challenges to the sufficiency of the evidence supporting the jury's verdict returned after a three-week trial.

## ISSUES PRESENTED

1. (Responsive to Petitioner's Issue 1) Whether the court of appeals correctly held that a corporate agent who commits fraud by stating his principal intends to perform acts when the agent has actual knowledge the principal never intends to perform can be held personally liable for fraud under "Texas' longstanding rule that a corporate agent is personally liable for his own fraudulent or tortious acts." *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002).

2. (Responsive to Petitioner's Issue 2) Whether the court of appeals correctly held that there was sufficient evidence to support the jury's answers regarding the "value" of Respondents' respective membership interests in LTHM where Respondents' expert testified what the value of the interests were and how to calculate the value and the jury charge provided no definition or instruction requiring the jury to use some other method.

3. (Responsive to Petitioner's Issue 3) Whether the court of appeals correctly held that there was sufficient evidence to support the jury's answers to support an award of exemplary damages.

## INTRODUCTION

The court of appeals was entirely correct when it reversed the district court's judgment nothwithstanding the verdict that absolved Yollick of liability for having masterminded of a fraudulent scheme to steal Respondents' ownership interests in a hospital system that they had purchased and rehabilitated. The court properly credited three weeks of testimony chronicling Yollick's fraudulent actions as well as the jury's unanimous finding of fraud against Yollick and adhered to black letter law holding corporate agents like Yollick accountable for their conduct. Under these circumstances, the review of this Court is not required and Yollick's petition should be denied.

Respondent investors purchased a faltering hospital system out of bankruptcy at First National Bank's request and diligently pursued its rehabilitation. Under Investors' stewardship, accounts receivable increased and the patient census grew exponentially, but—as all parties knew and expected from the outset—the hospital system was strapped for working capital in the initial months. Yollick capitalized on the opportunity to induce Investors into a fraudulent forbearance agreement through which he would divest them of their ownership, creating a boon for himself and his client First National Bank ("FNB").

The forbearance agreement provided that FNB would grant Investors a bridge loan for a period of at least 30 days and protect their ownership interests

14

while Investors secured financing to cover capital needs. Nevertheless, unbeknownst to Investors, the very same day Yollick signed the agreement on behalf of FNB, he convened meetings at his law office for the new straw company Merensky Reef to facilitate the takeover of Investors' ownership interest. The following day, Merensky Reef secretly purchased the hospital system in a transaction devised by Yollick and financed by FNB. Unaware of Yollick's scheme, Investors adhered to the forbearance agreement and secured the requisite financing, but their efforts were for naught; their ownership had already been secretly wrested from them. Merensky Reef, under the tutelage of Yollick and FNB, sold the hospital system to multiple third parties for nearly $56 million several months later.

Yollick orchestrated the entire coup dé etat: negotiating the deals, drafting the loan documents, signing the agreements, serving as counsel and adviser to FNB and Merensky Reef, hand-selecting close contacts—including his wife—to serve as directors of Merensky Reef. Using the pseudonym "Mara Drake," his wife Tamara Yollick became the sole trustee for the trust holding 100% of the shares of Merensky Reef and received a $10,000 payment for her services.

Yollick waived the primary basis for reversal argued in his merits brief—attorney immunity—by failing to raise the issue in his petition. Nevertheless, Texas law is clear that attorney immunity does not extend to fraudulent actions like

Yollick's. While he implores the Court to grant him immunity because he served as counsel for FNB, he failed to present any evidence during his case-in-chief or even to submit the immunity defense to the jury, despite his burden of proof. The jury reviewed extensive evidence and properly found Yollick—as well as FNB, for which he was an admitted agent, and Merensky Reef, another admitted agent of FNB—liable for fraud.

Months after the verdict, and contrary to its initial finding when the case was submitted to the jury, the district court concluded that no evidence supported the liability findings against Yollick but granted judgment for fraud and other claims against FNB and Merensky Reef. Yollick served as FNB's and Merensky Reef's counsel, steering their fraudulent actions and signing and drafting fraudulent documents on their behalf.

On appeal, the court of appeals concluded that the trial court erred in granting the JNOV. It reversed the trial court and found that there was legally sufficient evidence supporting the jury's finding that Yollick committed fraud and the jury's assessment of actual damages. It likewise rejected Yollick's attorney immunity claim and his challenge to the jury's assessment of exemplary damages.

Overwhelming evidence supported the jury verdict finding Yollick liable for the fraudulent scheme he orchestrated. The court of appeals properly applied longstanding and well settled Texas law, making review by this Court unnecessary.

## STATEMENT OF FACTS[2]

Respondents (hereafter, "Investors") purchased a hospital system out of bankruptcy in March 2009. Just two months later, Eric Yollick maneuvered a secret scheme to usurp Investors' ownership interests and resell the hospitals to third parties for a substantial profit.

Yollick wore "many hats" in the key transactions, including counsel for the Bank, 5.RR.151; 6.RR.82-83; 9.RR.195; 13.RR.215; counsel for Merensky Reef, 8.RR.250; 13.RR.192; agent of the Bank, 5.RR.151; CR.608; shareholder of the Bank, 13.RR.187; the husband of a Merensky Reef director, 13.RR.202; 15.RR.28; the husband of the trustee of the trust that owned the bank's shell company, Merensky Reef, PX3 at 3; 13.RR.184, 209, 211; trial counsel for the Bank; and a defendant himself. *See also* 6.RR.18-19; 9.RR.128-29, 195; 10.RR.94, 139-40, 214. As Yollick acknowledged, "I don't remember who I am sometimes." 10.RR. 94.

Acting as an attorney and agent, and furthering his own self-interest, Yollick committed fraud.

---

[2] References to the Clerk's Record are shown by CR.xxx or Supp.CR.xxx. References to the Reporters' Record are as follows. For the Reporters' Record during trial, references are in the format [volume].RR.[page number]. For other hearings, references are [date] RR[page number]. Plaintiffs' exhibits are designated as PX[number], and defendants' exhibits are designated as DX[number].

**The Bank and Yollick Seek a Potential Purchaser to Salvage the Hospital System**

In August 2008, the hospital system was placed into bankruptcy. 4.RR.224. The system consisted of three Texas hospitals: one located in Houston, one in Groves, and one in Dallas. 5.RR.155.

By late February 2009, the hospitals "essentially were virtually closed down" and the financial situation dire. 9.RR.183. No funds were available to run the hospitals. 14.RR.178. Operations were coming to a close, and patients were discharged. 9.RR.183-84; 14.RR.178-79. As one witness described, "We're talking about literally taking people out, while they're maybe on a stretcher, and transporting them to another hospital." 9.RR.258.

The Bank and Yollick, "looking for someone to act as an expert on hospital matters, hospital operations," contacted Greg Walker and Kailee Wong— principals of Investors JJJJ Walker, LLC, and KW Hospital Acquisitions, LLC, respectively, 4.RR.220; 10.RR.193-94, about a potential sale. 4.RR.97-100; 5.RR.152; 9.RR.184, 186, 293; 14.RR.175. Investors had experience in purchasing and rehabilitating faltering hospitals. 4.RR.87-89, 94-95; 13.RR.13-15, 40. Yollick participated in "virtually all" of the conference calls, and the principals of Investors joined "on a regular basis." 11.RR.209.

The Bank and Yollick had been planning to let the hospitals close. 4.RR.97. But through the discussions, the Bank and Yollick "recognized that if these assets

closed, that the value goes to zero." 4.RR.98-100; 9.RR.183-84. The hospital licenses would be forfeited, rendering worthless the hospital system and, thus, the Bank's long-time collateral. *See* 4.RR.98-100; 8.RR.27-28; 9.RR.183-84; 10.RR.83; 14.RR.174.

Feverish negotiations ensued over the weekend, 5.RR.73-74; 9.RR.293, as the Bank and Yollick were desperate to salvage the hospital system and the associated collateral. Investors determined that, "despite there being a major setback, there was still a very viable and good business that could be made out of—out of this, which ultimately would be a good positive to the community and would be a good thing for us to be able to continue to pursue and—and basically develop." 4.RR.95; 9.RR.184-85. The Bank's vice president and chief lending officer acknowledged that Investors' purchase "prevented the hospitals from shutting down and losing their licenses." 14.RR.179.

**Investors Purchase the Hospital System out of Bankruptcy**

At the insistence of the Bank and Yollick, Investors formed seven new limited liability companies—Louisiana Texas Healthcare Management, LLC ("LTHM"), and six subsidiaries—to purchase the hospital system out of bankruptcy. 4.RR.89, 93-94; 5.RR.155; 9.RR.192-94; *see also* PX35-PX46. Each subsidiary owned either the real estate or operations of a single hospital. *Id.* Investors collectively owned 100% of the interests in LTHM. PX138; 4.RR.90-92.

On March 16, 2009, the Bank lent LTHM and its subsidiaries $37,041,399.32 to purchase the hospitals out of bankruptcy. PX26 at 2; *see also* PX27-PX46; 4.RR.152; 5.RR.22; 11.RR.101-02, 103-06; 14.RR.160; 15.RR.17. Approximately $32 million of the purchase price was allocated to almost all of the pre- and post-petition debt owed to the Bank, and the remaining $5 million was allocated to current accrued operating expenses, payroll, past due ad valorem taxes, and initial working capital. 4.RR.103-04, 123-24; 9.RR.187-88; 13.RR.49-50, 56-57. No accounts receivable were available. 11.RR.126; 14.RR.178-80. "At the end of the day, [Investors] got roughly about $3 million to run three empty hospitals for the next month or two." 4.RR.103. Yollick prepared the loan documents. 12.RR.121-22.

To collateralize the $37 million indebtedness, the Bank took liens on all real and personal property, including equipment and future accounts receivable of LTHM and its subsidiaries, as well as $3.25 million in CDs. 4.RR.126, 198; 11.RR.92, 116, 120-22. The Bank assessed LTHM's assets at a collateral value of approximately $56 million on its new loan request forms. PX26-PX34; 11.RR.120-22; 15.RR.16-17. The collateral value was "an important factor" for the Bank in approving the loan. 8.RR.35, 86-88.

Curtis Brockman, the Bank's vice president and chief lending officer, testified that the Bank had $19 million in equity based on the lending transaction,

which "is a substantial amount of equity to have for a bank." 15.RR.17-18; *see also* 8.RR.35.

**Investors Immediately Strive to Salvage the Hospital System**

Investors purchased a hospital system in disarray. Just two to three patients remained in the system. 9.RR.191; 11.RR.125-26; 13.RR.43. There was "zero staffing morale." 13.RR.38-39. "There were not enough supplies," nor were there "enough doctors to participate." 13.RR.69. Accounts receivable were nonexistent. 9.RR.191; 14.RR.179-80. Investors "needed money basically for everything at that point." 4.RR.99-100; 13.RR.72; 14.RR.179-80, 182, 186-87.

There was "absolutely zero confidence" from the community. 13.RR.44. The system had caused "heartache" to "a lot of people, having to move hospitals, physicians who were practicing medicine or had privileges at the hospital essentially having to scramble last minute to get privileges somewhere else to continue their practice." 10.RR.24. "Everybody was very anxious." 13.RR.39.

Investors conveyed their concerns to Yollick and other Bank representatives about having insufficient capital "to essentially start a hospital with two patients and to get it back up to where we could support it and be cash flow neutral." 4.RR.105-07; 9.RR.188-91; PX64. Linda Burley, the Bank's branch president, knew "there would not be cash coming in." 11.RR.126; *see also* 12.RR.133, 14.RR.179-80, 182, 186-87. Brockman likewise recognized that "it would take

some amount of time to regenerate the patient count and the accounts receivable that are derived once the patient count is increased to be able to support the operations of the hospital." 14.RR.179-80. However, Brockman represented that the Bank would work with Investors on short-term capital needs to operate the hospitals. PX64; 4.RR.105-07; 9.RR.188-91; 14.RR.184-87.

Investors "immediately" strove to salvage the hospital system's value. 4.RR.131; 9.RR.206; 13.RR.34. Their aim was to "go out into the communities and partner with practicing physicians" in order to "create a very healthy" hospital system. 9.RR.206; 13.RR.34, 67, 75. Investors began speaking with "the physicians, community, and also the staff" on "a regular basis" and developed initiatives to "streamline their responsibilities." 4.RR.131; 13.RR.34, 75. They were also "trying to set the stage for" the recruitment of a specialist doctors team because patients go to hospitals "for their physicians." 13.RR.67-68. As Dr. Raj Talluri, principal of Respondent Priya Properties, LLC, explained: "I invested my money, my time, my efforts, my contacts, countless number of hours and the travel and staying with the community and the doctors in the meetings." 13.RR.47.

Investors diligently marketed the hospital system and searched for outside investors and capital. They talked to "lenders and AR lenders, really just everybody in the business." 4.RR.144-45; 9.RR.204-05, 215, 224.

Investors' efforts proved successful. They increased the accounts receivable, and the patient census was "reaching upwards to 70's and sometimes 80's" within a month. 13.RR.76; *see also* 15.RR.24. They were in "constant communication" with the Bank, whose officials commended Investors' efforts and the improving economic outlook. 4.RR.132-33, 146-47; 9.RR.210; 15.RR.21-22, 24. The Bank representatives "certainly told" Investors "how happy [they] were" and that Investors "were doing a great job." 4.RR.132-33. "The general trend was very positive." 9.RR.210. Dr. Talluri testified that "we built the hospital from zero patients, zero morale of the staff to the point" where the hospitals could eventually "be self-sustaining." 13.RR.148-49.

**The Bank and Investors Amend the Loan Agreement**

Collections were growing as a result of Investors' industrious efforts, but working capital was still needed to bridge operations in the initial months. Indeed, the "need for working capital" increased "even more as [the hospitals] got busier." 13.RR.76-77. Nevertheless, in April 2009, the Bank refused to advance any money and instead released to LTHM $2.5 million in CDs that Investors had previously pledged as collateral. 4.RR.139-41; 9.RR.208-09; 11.RR.141-42; 13.RR.78-79; 15.RR.23-24. Burley explained that Investors "had to have working capital so we gave them back their money." 11.RR.142; *see* PX49.

The transaction was memorialized in an amended loan agreement, dated April 14, 2009. DX12. No payments were due at the time the amended agreement was entered. 4.RR.142, 144; 9.RR.211; 11.RR.140. The amended agreement provided that payments on the Bank note would be due quarterly, not monthly, making the first payment due June 16, 2009. 4.RR.143; 9.RR.211; 11.RR.140; DX12 ¶8.

Investors "spent every single dollar" of their $2.5 million "towards the operations and working capital." 4.RR.144; 13.RR.83, 84.

**Investors Enter a Forbearance Agreement to Obtain Working Capital from the Bank**

Although the release of the CDs infused Investors' money into the company, the hospital system "still" grappled with "serious cash flow issues" in the short term. 4.RR.150; 9.RR.212-13. Investors "were cash constrained" and needed to continue building the hospitals to enable the system to become "cash flow neutral." 9.RR.213. Investors were "trying to find a way to raise outside capital," but were strapped for working capital. 4.RR.150, 155; 9.RR.215; *see* DX4 at 1.

Yollick suggested that Investors consider turning over their voting rights in LTHM to a trust. 11.RR.207-08. He and other Bank officials participated in a conference call with Investors to negotiate the terms of a new agreement. 13.RR.89-90. On May 14, 2009, less than 60 days after Investors purchased the hospitals, Investors and the Bank entered into a forbearance agreement that

24

purportedly would protect Investors' interests and provide for their receipt of a bridge loan to cover operating expenses for a period of at least 30 days (the "forbearance period").

Relevant provisions of the forbearance agreement include the following:

- Paragraph 1: "FNB shall extend a working capital loan to fund the ordinary and necessary operating expenses under a loan facility (the 'FNB Bridge Loan') to Merensky Reef Hospital Corporation ('MRHC') for a period of at least 30 days from the first date that funds are advanced by FNB (the 'Forbearance Period')";

- Paragraph 2: "During the Forbearance Period, the members of LTHM (the 'Members') shall continue its efforts to raise additional equity or alternative funding sources . . . sufficient to retire or satisfy the FNB Bridge Loan and with the objective of providing for additional working capital needs that the LTHM Group may require. Regardless of any other provision herein, the Members shall be permitted to continue the above described efforts and shall have reasonable access to the LTHM Group, its personnel and records for those purposes";

- Paragraph 3: "FNB agrees to permit the LTHM Group to grant second liens (subordinate to liens held by FNB) on the LTHM Group's real and/or property assets owned by the LTHM Group (e.g., the

25

Facilities) to any new lender/investor in connection with obtaining the Additional Funding";

- Paragraph 7: "MRHC shall hold the Transfer Documents in trust, but shall have full and exclusive right to vote the Members' membership interests during the Forbearance Period and if the Members fail to effectuate the satisfaction of the Bridge Loan by the end of the Forbearance Period, then after the Forbearance Period as well . . .";

- Paragraph 8: "The obligations of the LTHM Group to the Members arising under the corporate governance documents shall in no way be deemed modified, altered, amended or extinguished by the terms contained herein, including any obligation of the LTHM Group, or any one of them, to indemnify and hold harmless the Members from demands claims or actions";

- Paragraph 9: "During the Forbearance Period i) the LTHM Group shall not take any action that would result in a material adverse effect upon the LTHM Group's value, operations, assets, members, governance or liabilities and, ii) FNB and the LTHM Group shall coordinate with the Members any efforts to market the Facilities, the operations being undertaken at the Facilities";

- Paragraph 10: "If as permitted under the terms hereof, the LTHM Group does not retire or satisfy the Bridge Loan within the Forbearance Period and FNB elects to release the Transfer Documents, the members of LTHM shall use their commercially reasonable efforts to effectuate the orderly transition . . .";

- Paragraph 11: "The parties will take all reasonable efforts to cooperate in connection with operating the Facilities during the Forbearance Period"; and

- Paragraph 12: "Any and all proposed business expenditures outside the ordinary course of business in excess of $20,000 to be made by the LTHM Group during the Forbearance Period shall be subject to prior approval by the members, such approval not to be unreasonably withheld."

PX6.

The forbearance period would begin once the Bank advanced a working capital loan. PX6 ¶1; *see also* 9.RR.274. During the forbearance period, the "only thing that was supposed to go in trust was membership voting rights." 10.RR.101-02. The forbearance agreement provided for Investors to execute blank "Assignments in Lieu of Foreclosure," which could conditionally be used to transfer Investors' membership interests in LTHM to Merensky Reef through an

"orderly transition" only if and after both the forbearance period expired with the bridge loan unsatisfied and the Bank elected to have the assignments released from trust. PX4 ¶¶4, 7, 10. The assignments were never executed, 4.RR.169-71, 175-76, 187; 9.RR.233, 234-35, and the Bank and Yollick did not furnish any proposed forms of assignment until after transferring Investors' ownership interests to Merensky Reef, 4.RR.194-95; 9.RR.231.

Yollick signed the agreement on behalf of the Bank. DX4 at 4. Investors also signed the agreement as well, relying on the representations therein to be true. DX4; 4.RR.177, 185-88, 193-94, 196; 9.RR.230-31; 10.RR.112-13, 190-92, 195-96; 13.RR.91-94.

**Investors Proceed to Secure Investors**

Investors complied with the forbearance agreement and "worked very hard" to secure additional operating capital during the forbearance period. PX135; DX75; 4.RR.163-65, 167, 178-79, 194; 13.RR.100. They also continued meeting with community members to rebuild confidence in the hospitals. 13.RR.100-01, 104-05.

Investors successfully located investors and presented the Bank multiple outside funding options, which the Bank itself acknowledged would have fully satisfied the obligations under the forbearance agreement and provided additional operating capital. PX56; PX58; PX59; 4.RR.163-65; 167, 179-80, 187; 9.RR.228-29; 10.RR.106, 193; 12.RR.26, 29, 164; 13.RR.101-03; 15.RR.44-46, 48-49.

Nevertheless, the Bank summarily rejected the proposals. 4.RR.165-66, 179-80, 187; 9.RR.228-29; 10.RR.193; 13.RR.103-04; 15.RR.44-45. Investors did not realize "at the time" that the Bank "couldn't have accepted" their proposals because it had transferred their ownership interests. 9.RR.229; 10.RR.162-63, 193. Investors "went into this with good faith and all the intention in the world to continue to work to live up to [their] part of the bargain" and "raise more money." 4.RR.184; 10.RR.161. Investors did not know "that the assets were transferred out of [their] name to another entity" but instead pursued funding as though they "still had the ability to satisfy the bridge loan." 10.RR.160.

**Yollick Orchestrates a Secret Meeting to Facilitate Transfer**

Unbeknownst to Investors, on May 14, 2009, the same date as the forbearance agreement, Yollick held a series of meetings at his law office to convene and appoint the new directors of Merensky Reef, a straw company and stipulated agent of the Bank. PX3; PX4; PX5; CR.608; 4.RR.161-62; 5.RR.169; 8.RR.240; 9.RR.77-79; 13.RR.213, 216-17.

Yollick recruited the Bank's paid consultant, Duane Rossman; his long-time friend and client, Jim Jenkins; and his wife, Tamara Yollick, using the disguised name "Mara Drake," to become directors of the new company. 5.RR.155-56, 161; 6.RR.8, 21; 8.RR.221, 228-29; 13.RR.190, 243-44. Jenkins had no background in the banking or hospital business. 8.RR.224-26. Likewise, Mrs. Yollick had no

experience in the banking, financing, or hospital industries and admittedly was "not qualified" to make decisions about Merensky Reef's transactions. 13.RR.185, 220-21, 243-44.

In an effort to conceal his wife's involvement, Yollick instructed his wife to sign all conveyance and corporate documents with the moniker "Mara Drake," a combination of her nickname "Mara" and maiden name "Drake." *See* 13.RR.177-78, 202. Mrs. Yollick explained that she used the "assumed name" because "Eric [Yollick] asked [me] to do so." 13.RR.178, 202-03. She acknowledged that the name "Tamara Yollick" is on her driver's license and that she has identified herself as "Tamara Yollick" for at least the last nine years. 13.RR.175-76, 198. Kailee Wong testified that "the fake name" was especially troubling to him because "it makes me feel as though you're actually trying to hide something" and "just really trying to be deceitful about who" Mrs. Yollick is. 9.RR.230.

An organizational meeting of Merensky Reef's board of directors convened at Yollick's office at 7pm on May 14, 2009. PX3; 5.RR.169. The new directors unanimously authorized "Mara Drake," as the trustee of Witwatersrand Trust, to purchase all the stock of Merensky Reef. *See* PX3 at 3; 5.RR.167; 13.RR.209. Mrs. Yollick explained that she served as sole trustee of the sole shareholder of Merensky Reef "because Eric [Yollick] asked me to." 13.RR.184, 222, 225-26, 258.

Five minutes later, at 7:05pm, another Merensky Reef meeting convened at Yollick's office. PX4. The meeting's purpose, according to the minutes, was to name Rossman, Jenkins, and "Mara Drake" as the directors of the corporation. PX4.

Ten minutes later, at 7:15pm, a special meeting of the Merensky Reef board of directors convened at Yollick's office. PX5. The meeting minutes contained resolutions showing that the directors approved "the execution of any and all necessary loan documents" between the Bank and Merensky Reef for the "purchase of the Renaissance hospitals and obtain an appropriate working capital facility." PX5. The resolutions and accompanying exhibits provided the terms under which the Bank would provide financing to Merensky Reef, identifying the collateral to include an "assignment of all stock in LTHM." PX5. The resolutions also stated that Merensky Reef would "enter into" the forbearance agreement. PX5. An unexecuted copy of the forbearance agreement was attached as an exhibit. Exh. A to PX5.

As confirmed by the minutes, rather than just holding the voting rights of LTHM as provided in the forbearance agreement, Merensky Reef instead purchased full ownership of LTHM and the hospital system, without Investors' knowledge or authority. *See* PX3, PX5, PX12, PX14.

Yollick was at the epicenter of the transactions. He scheduled and attended the meetings and drafted the minutes. *See* 8.RR.240, 245-46, 250; 9.RR.81-83, 88, 163-65. He served as counsel for Merensky Reef, 6.RR.18-19; 8.RR.250; 13.RR.192, and provided advice that dictated the directors' and shareholders' votes, signatures, and actions, *see* 8.RR.245, 247, 250; 9.RR.75, 99, 128-31. Jenkins testified that he relied on Yollick to decide what was best for the company and that he "sure did" take the direction of Yollick when signing documents and adopting resolutions. 8.RR.245, 250; 9.RR.75, 83, 99, 124, 128, 130-31. Jenkins "relied upon [Yollick] to make the right decision for Merensky Reef Hospital Corporation." 9.RR.74, 165. Mrs. Yollick acknowledged that she depended on her husband "to make decisions about the best courses of action" for Merensky Reef. 13.RR.205, 221-24, 226, 241-42, 244-45, 254-55.

Yollick himself, when questioning the principal of KW Hospital Acquisitions, LLC, emphasized that Mrs. Yollick would naturally follow his directions:

> Q. And you would agree, would you not, that the wife of the attorney for First National Bank is likely to be someone who would be under the control of First National Bank, at least as far as what to do with a trust company?

A.     Well, especially if -- yeah, if you're – if it's your wife, I'm sure your wife will do virtually anything for you.

Q.     Well, Mr. Wong, I mean –

A.     I'm just saying from a -- relationshipwise, like they're going to –

Q.     You don't know of anything that would make Mara antagonistic to Eric Yollick, do you, other than just the way I am generally perhaps?

A.     No, no.

Q.     You don't know of anything, do you?

A.     I don't.

Q.     You don't know of anything that would make Mara antagonistic to First National Bank, do you?

A.     I don't know Mara Drake at all.

9.RR.280-81.

Mrs. Yollick received $10,000 in compensation for her services for Merensky Reef. 9.RR.131; 13.RR.255-56. Saul Ortega, the Bank's chief financial officer, director, and member of loan and discount committee, testified that the payment to Yollick's wife was "unusual." 8.RR.92-93.

**Merensky Reef Purchases the Hospitals**

The following day, on May 15, 2009, without the knowledge or consent of Investors, Merensky Reef purchased the hospital system in a transaction financed by the Bank. 4.RR.177, 184-86, 190, 196; 9.RR.230-31; 10.RR.190. Again, the Bank assigned LTHM's assets a collateral value of approximately $56 million. PX51; 11.RR.123-24. Yollick drafted the loan documents. *See* 9.RR.164; 11.RR.146-47; 12.RR.204, 207; 15.RR.194; PX10, PX11, PX51.

Yollick prepared the assumption promissory note and assumption deed of trust, pursuant to which Merensky Reef assumed the entire $37,041,399.32 of LTHM's outstanding indebtedness to the Bank. PX12; PX14; 15.RR.30, 31-33, 37-38. The stated purpose of the loan was the "Purchase of the three Renaissance Hospitals." PX14 at 2; 15.RR.36-37. The assumed indebtedness was collateralized by all of the real property of LTHM. PX14; 15.RR.35-36. The ownership rights in LTHM and the hospital system transferred to Merensky Reef on May 15, 2009. 6.RR.31; 9.RR.168-69; 15.RR.42-43.

Brockman explained that the Bank financed Merensky Reef's purchase of the hospitals on May 15, 2009: "The funds went to pay off our existing notes, and there was a transfer of stock to Merensky Reef." 15.RR.39. Merensky Reef's assumption of debt "was an asset on [the Bank's] books." 15.RR.40. Brockman

acknowledged that the forbearance agreement did not authorize the Bank to take ownership of the hospitals. 15.RR.27; *see also* 10.RR.188, 191.

Also on May 15, 2009, Merensky Reef executed the Renewal, Modification and Extension Agreement—again prepared by Yollick—under which Merensky Reef assumed an additional $5,297,950 of the hospital system's pre-bankruptcy debt that LTHM had not been obligated to pay and that the Bank was precluded from recovering and had written off years earlier. PX13; 15.RR.32. The agreement secured the additional nearly $5.3 million debt with the Houston hospital. PX13; 15.RR.32-34, 36. Brockman acknowledged that adding another $5.3 million in debt, collateralized by the Houston hospital, and putting the "obligation on its books as a loan [was] a benefit to FNB." 15.RR.34-35. He testified that he was aware of no authority that permitted Merensky Reef to assume the $5.3 million debt. 15.RR.34; *see also* 4.RR.190. Rossman acknowledged that he could not think of "any business purpose that served the interests" of Merensky Reef "by taking on this additional 5 million dollars' worth of debt." 6.RR.29.

The straw company Merensky Reef did not even keep track of any transactions. Jenkins, who served as chairman and director of Merensky Reef, never found out what happened to the money that was purportedly sent from the Bank to Merensky Reef: "We don't have any bank accounts. It wasn't sent to us." 9.RR.115; *see also* 9.RR.130. He had no reason to worry; he just relied on Yollick

to "handle things." 9.RR.116. Mrs. Yollick similarly testified that she is not aware of any bank or checking accounts that Merensky Reef might have. 13.RR.191-92.

Mrs. Yollick knew nothing about why Merensky Reef was formed, nor did she know its purpose. 13.RR.189. And Rossman testified that he does not know how much Merensky Reef owes the Bank, nor does it matter because Merensky Reef "doesn't really have a whole lot of obligation for that." 6.RR.46.

The Unanimous Consent in Lieu of Meeting of Louisiana Texas Healthcare Management, LLC, dated May 22, 2009, and drafted by Yollick, declared Merensky Reef to be the "*sole Member*" of LTHM. PX18; *see also* 5.RR.182-83 (agreeing that Merensky Reef became "the sole owner of Louisiana Texas Healthcare Management, LLC, on May 15, 2009"); 9.RR.167-69 (Merensky Reef "became the owner of the member interest in LTHM" on May 14 or 15, 2009); 15.RR.36 (agreeing that in order "for the bank to have a valid lien on property," it is "necessary for the party that is granting that lien"—here, Merensky Reef—"to have ownership rights in that property.")). The Unanimous Consent removed any previous managers of LTHM and declared Rossman to be LTHM's "sole Manager" and "sole officer, Chairman of the Board, Co-Chief Executive Officer, President, and Secretary." PX18. The Unanimous Consent also removed "all existing officers" of each of the LTHM subsidiaries and replaced them with Rossman "as sole officer, Manager, President, Secretary, and Chief Executive

Officer." PX18. And as Brockman testified, "a transfer of ownership" of the hospitals to Merensky Reef had been "done by the stock transaction earlier on." 15.RR.42.

Burley acknowledged that Yollick was responsible for the transactions: "No question he's been in control of this." 12.RR.74.

**Merensky Reef Sells the Hospital System in a Transaction Financed by the Bank**

Merensky Reef sold the hospital system to multiple third parties within months of the unauthorized takeover without ever consulting or even advising Investors. Brockman explained that "Merensky Reef was the owner of the hospitals," and the Bank "needed to find somebody to operate, to own" quickly. 15.RR.58.

On August 27, 2009, the hospital located in Houston was sold for $7.4 million, PX63; 11.RR.131-32; 15.RR.50-52, 53, 56-57, bringing the loan balance to zero, PX75; PX76; PX77; 8.RR.114-115, 119-20; 11.RR.157-58. On October 29, 2009, the hospital located in Groves was sold for $17 million, PX62; 11.RR.131; 15.RR.53-55, 56, bringing the loan balance to zero, PX78; PX79; PX80; 8.RR.114-115; 11.RR.156-57. On October 30, 2009, the hospital located in Dallas was sold for approximately $31 million, PX61; 11.RR.131; 15.RR.55-56, bringing the loan balance to zero, PX31; PX71; PX72; PX73; 8.RR.114-115;

11.RR.153-56. Yollick drafted the loan documents for these transactions as well. 15.RR.52.

Investors were left with nothing. 9.RR.234. As Dr. Talluri explained: "I invested my money and time into these three hospitals, which required a major overhaul. . . . We got into this, and we were sincerely trying to get these hospitals going. And suddenly we were told we no longer owned the hospitals anymore and the hospitals were taken away from our control." 13.RR.99.

Kailee Wong explained that Investors were kept in the dark: "we didn't know what was going on. . . . there was no transparency . . . we just knew that we kept continuing to get locked out or said no to." 9.RR.228; *see also* 10.RR.164. He did not expect the Bank to transfer his ownership rights to Merensky Reef the day after executing the forbearance agreement: "There is no way you would ever sign something like that." 9.RR.226; *see also* 9.RR.230-31; 10.RR.191-92, 195-96. The "actions were essentially contrary to exactly what they just wrote a day before. . . . Immediately the next day, the membership interests and assets were taken" from Investors. 10.RR.195.

Greg Walker explained that Investors' "understanding was pretty simple" when entering the forbearance agreement: "They would forebear, they wouldn't do anything with our interests. We were giving them our voting trust, only our voting rights of our company. They were putting that in trust while we went out and

raised money." 4.RR.171. But Investors were blindsided: "Never in a million years did we expect them to do the things they did at all." 4.RR.171; *see also* 4.RR.177, 187-88, 196. And Investors "[a]bsolutely" would "not" have signed the forbearance agreement had they known of the plans to promptly sell LTHM and its assets. 4.RR.185-86.

**Investors Obtain a Unanimous Jury Verdict Against Yollick, the Bank, and Merensky Reef**

Having lost their membership interests in LTHM because of the fraud the Bank, Merensky Reef, and Yollick perpetrated, Investors filed suit. CR.187. After the district court denied the defendants' various pretrial motions seeking dismissal of this case, *see, e.g.*, CR.147, 186, the case went to trial in June 2012. Yollick and his co-defendants moved for directed verdict at the end of Investors' case. The district court denied their motion. 17.RR.8. At the charge conference, the Bank, Merensky Reef, and Yollick challenged the sufficiency of the evidence again. Supp.CR.674. The district court rejected these challenges again, 17.RR.27, and submitted the case against Yollick and his co-defendants to the jury.

On July 11, 2012, the jury returned its verdict. 18.RR.8. The jury unanimously found that the Bank, Merensky Reef, and Yollick each committed fraud. CR.610. The jury found that Investors suffered compensatory damages of:

JJJJ Walker, LLC — $4,585,512

Dynafab USA, LLC — $382,126

Renaissance Properties of Texas — $1,719,567

Priya Properties, LLC — $4,776,575

BD Texas, LLC — $3,439,134

KW Hospital Acquisition, LLC — $4,203,386

CR.611. The jury further found that the Bank was responsible for 80% of each Investor's harm, while Merensky Reef and Yollick were each responsible for 10% of the harm. CR.631-36. The jury further held that Yollick should also pay exemplary damages to each Investor. CR.650. The jury awarded between $114,000 and $1,425,000 to each Investor against Yollick. *Id*.[3]

After the jury was excused, the Bank, Merensky Reef, and Yollick filed a motion for JNOV. CR.659. The district court heard the motion on August 6, 2012. 8/6/12 RR.11. Almost four months later, the district court entered its final judgment. CR.1262. In its final judgment, the court held the Bank jointly and severally liable for all of Investors' damages (over $19 million total) and further ordered that the Bank pay Investors approximately $38 million in exemplary damages. CR.1263-65. The court further ordered Merensky Reef to pay approximately $1.9 million in compensatory damages and about $5.7 million in exemplary damages. *Id*. But even though it had repeatedly rejected Yollick's challenges to the sufficiency of the evidence, the court ordered that Investors take

---

[3] The jury awarded each Investor a different amount of exemplary damages against Yollick. CR.650.

nothing on their claims against Yollick based solely on insufficiency of the evidence supporting the jury's answers regarding Yollick's liability. CR.1265. It did not find insufficient evidence regarding Investors' damages. *Id.*

The Investors appealed the district court's judgment in favor of Yollick. The court of appeals reversed the district court's take-nothing judgment. The court of appeals found legally sufficient evidence to support the jury's finding that Yollick committed fraud, and that the trial court erred in granting the JNOV on that basis. Op. at 2. The Court further concluded the jury's assessment of actual damages was supported by legally sufficient evidence, that Yollick's conduct is not protected by attorney immunity, and that there was sufficient evidence to support the jury's award of exemplary damages. Op. at 29-30. The Court reversed the portion of the judgment in which the trial court ordered that Investors shall take nothing on their claims against Yollick and remanded to the trial court for rendition of judgment consistent with the opinion. *Id.*

Fraud is anathema to the professional responsibilities of an attorney. Texas law extends attorney immunity to certain lawful conduct undertaken in the representation of a client but does not countenance fraud. While Yollick clings to the shield of attorney immunity, the fraudulent scheme he orchestrated merits no protection. Moreover, he waived his opportunity to make an attorney immunity argument to this Court by failing to raise the issue in his petition.

Yollick signed a forbearance agreement on FNB's behalf knowing that neither he nor FNB had any intention of honoring or performing it. Yollick, as FNB's agent, immediately disregarded its provisions and devised a takeover of Investors' ownership in the hospital system. The same day Investors and FNB entered the forbearance agreement, Yollick convened meetings at his law office for the shell company Merensky Reef and hand-picked its new directors—including his wife, Tamara Yollick, who used the guise of the assumed name, "Mara Drake." The following day, without Investors' knowledge or consent, Merensky Reef purchased the hospital system in a transaction financed by FNB. Yollick drafted the loan documents.

At trial, Yollick came nowhere close to satisfying his burden of proof on attorney immunity as he presented no evidence during his case-in-chief and failed to present the defense to the jury. The district court correctly denied Yollick's

motion for a directed verdict at the close of the evidence, after lengthy argument by defense counsel, and again found sufficient evidence to submit Yollick's fraud to the jury when it overruled Yollick's objections to the charge. Nevertheless, months after the verdict, the district court found legally insufficient evidence as to the jury's finding of fraud liability against Yollick.

Notably, the district court did not grant JNOV based on Yollick's challenges to the damages evidence. The jury properly determined the value of Investors' ownership interests by subtracting liabilities from assets. The value was corroborated by a sale of the identical assets within a few months of the fraud. Expert testimony as well as FNB's own valuations of the same assets further supported the damages award.

A jury of Yollick's peers found that he was a knowing and voluntary co-participant with FNB and Merensky Reef in a fraudulent scheme. Yollick—an admitted agent of FNB and the architect of Merensky Reef—stood at the helm of the fraud. Allowing Yollick to evade liability for his fraudulent actions totally disregards the unanimous verdict of the jury, contravenes well established principles of Texas law, and erodes the integrity of legal counsel.

**I.** **THE AFFIRMATIVE DEFENSE OF ATTORNEY IMMUNITY IS NOT BEFORE THE COURT AND DOES NOT ABSOLVE YOLLICK OF HIS FRAUD.**

Yollick begins his merits argument by claiming that attorney immunity precludes liability for his fraud. But this affirmative defense is not a basis for reversal for two independent reasons. First, Yollick failed to raise attorney immunity as an issue in his petition for review. Having waived the issue, it is not properly before the Court. Second, even if Yollick properly presented the issue, the defense is inapplicable and does not absolve him of his liability for fraud.

**A.** **Yollick Waived Review Of Attorney Immunity By Failing To Raise The Issue In His Petition For Review.**

Texas Rule of Appellate Procedure 53.2(f) commands that a petitioner include in a petition for review "all issues or points presented for review." Further, Rule 55.2 requires that "petitioner's brief on the merits must be confined to the issues or points stated in the petition for review" and prohibits the petitioner from using the brief on the merits to "raise additional issues or points or change the substance of the issues or points presented in the petition." *Id.* TEX. R. APP. P. 55.2(f). Accordingly, when a petitioner fails to advance an issue in its petition for review, that issue is waived. *See, e.g., Ramos v. Richardson*, 228 S.W.3d 672, 673 (Tex. 2007) (citing Rule 55.2 and finding issue not raised in petition to be waived); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010) (citing Rules

44

53.2(f) and 55.2(f) and stating that Court "should not stretch for a reason to reverse that [which] was not raised").

Yollick's Petition for Review identifies five issues:

1. When an attorney signs a contract as the agent of his client, who is disclosed in the contract itself as the principal, can the attorney be individually liable for fraud if a jury later determines that the client never intended to perform the contract?

2. Was there legally sufficient evidence that the defendants had never intended to perform the contract, given that they sold the hospitals—as permitted by the contract—only *after* the plaintiffs had failed to repay the bridge loan?

3. Did the court of appeals err by allowing the plaintiffs to recover the value of their membership interests in the hospitals, when even their own expert conceded that value had *never* been calculated with all liabilities in one complete calculation?

4. *Unbriefed*: Is the evidence legally sufficient to prove Yollick committed fraud?

5. *Unbriefed*: Is the evidence legally sufficient to prove Yollick acted with malice?

(Pet. 8 (original emphasis)) None of these issues includes the affirmative defense of attorney immunity.

Yollick may argue that the Court must liberally construe his issues and that Issue 1 could be stretched to include attorney immunity, even though nowhere in his entire petition does the word "immunity" or the phrase "attorney immunity" appear. But to accept such an argument would mean that Rules 53 and 55 are no constraints at all. Yollick's Issue 1 raises the issue of agent and principal and the liability that arises out of that relationship when the agent himself commits a fraud. A fundamentally different legal issue, attorney immunity is an affirmative defense that is specific to the unique role that an attorney plays in litigation and provides that "an attorney generally has immunity from claims by an opposing party based upon conduct the attorney undertook in the representation of a client, but this immunity does not apply to alleged torts based upon the attorney's fraudulent or malicious conduct." *James v. Easton*, 368 S.W.3d 799, 802 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

Not even a liberal reading of Yollick's Issue 1 includes the affirmative defense of attorney immunity, and therefore he has waived that issue before this Court. Accordingly, attorney immunity is not before this Court, is not a basis for granting review, nor is it grounds for reversing the court of appeals's decision.

**B.** **Even If The Issue Of Attorney Immunity Were Before The Court, It Would Not Absolve Yollick Of His Fraud.**

    **1.** **Yollick did not conclusively establish the affirmative defense of attorney immunity.**

As an initial matter, it was Yollick's burden to prove the affirmative defense of attorney immunity. *Mendoza v. Fleming*, 41 S.W.3d 781, 788 (Tex. App.—Corpus Christi 2001, no pet.) (holding that appellees failed to establish affirmative defense of attorney immunity as a matter of law because material fact issue existed concerning whether appellees' actions were within bounds of the law). Because Yollick presented no evidence during his case-in-chief and the immunity defense was not submitted to the jury, he was only entitled to JNOV based on this defense if he conclusively established the defense as a matter of law. *Whitney Nat'l Bank v. Baker*, 122 S.W.3d 204, 207 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (stating that, when affirmative defense was not submitted to jury, court reviews record to determine whether issue was disputed or whether defense was conclusively established by evidence). Investors presented substantial evidence establishing that Yollick not only engaged in fraudulent conduct, as the jury found, but that Yollick in fact orchestrated the entire scheme. In contrast, and far from conclusively establishing the defense, all Yollick offers this Court is the claim that "the allegedly fraudulent conduct was undertaken as part of the discharge of Yollick's duties to his clients." Br. 23.

With only the argument that his fraudulent conduct was undertaken as party of discharging his duties to his client, Yollick tries to hang his entire defense on this Court's recent decision in *Cantey Hanger v. Byrd*, — S.W.3d —, 2015 WL 3976267 (Tex. 2015). Indeed, it is the only case he cites regarding immunity in his brief.

But Yollick's reliance on *Cantey Hanger* is misguided. Based on *Cantey Hanger*, Yollick contends that if his wrongful conduct falls within the scope of his legal representation to his client, then liability to third parties should be barred by the defense of attorney immunity. Br. 23. But *Cantey Hanger* made clear that its analysis *did not* consider the attorney immunity doctrine's application outside of the litigation context. *Cantey Hanger*, 2015 WL 3976267, at *3 n.6. Thus, any attempt by Yollick to invoke *Cantey Hanger* to support his waived defense of attorney immunity in this case must be rejected.

### 2. Attorney immunity does not apply to Yollick's fraudulent conduct.

Although attorneys are generally immune from claims by opposing parties for conduct undertaken in the representation of a client, this immunity does not apply to fraudulent conduct. *James*, 368 S.W.3d at 802. An attorney's participation in fraudulent conduct is "entirely foreign to the duties of an attorney." *Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882).

An attorney is liable for fraud "if he knowingly commits a fraudulent act that injures a third person, or if he knowingly enters into a conspiracy to defraud a third person." *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ) (affirming judgment against attorney for knowingly assisting client in extorting a payment to which the client had no legal right); *see also Estate of Stonecipher v. Estate of Butts*, 686 S.W.2d 101, 103 (Tex. 1985) (affirming judgment against attorney for conspiracy to defraud where attorney received title to client's property before judgment and then transferred title back to client after the judgment creditor ceased trying to collect).

In *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366 (Tex. App.—Houston [1st Dist.] 2012, pet. denied), the court reversed a summary judgment ruling in favor of attorneys alleged to have knowingly drafted fraudulent documents designed to hide their clients' assets from judgment creditors. The court explained that attorneys will be held liable for "knowingly drafting fraudulent documents," and cannot escape liability "for the loss sustained by reason of their own wrongful acts on the ground that they are the agents of their clients." *Id.* at 382. Quite simply, "no one is justified on that ground in knowingly committing willful and premeditated frauds for another." *Id.* (quoting *Poole*, 58 Tex. at 137-38).

In *Likover*, an attorney allegedly assisted his client in a fraudulent business scheme involving the sale of an apartment complex. *Id.* at 471. The court rejected the attorney's argument that he could not be held liable to non-client third parties for actions done in the course of representing a client. "[A]n attorney is liable if he knowingly commits a fraudulent act that injures a third person, or if he knowingly enters into a conspiracy to defraud a third person." *Id.* at 472.

*Likover* cited this Court's longstanding rule that "where a lawyer acting for his client participates in fraudulent activities his action in so doing is 'foreign to the duties of an attorney.'" *Id.* at 472 (quoting *Poole*, 58 Tex. at 137). *See also McKnight v. Riddle & Brown, P.C.*, 877 S.W.2d 59, 61 (Tex. App.—Tyler 1994, writ denied) ("where an attorney acting for his client participates in fraudulent activities, his action is 'foreign to the duties of an attorney'") (citation omitted). An attorney cannot "shield himself from liability on the ground that he was the agent of [his client], for no one is justified on that ground in knowingly committing willful and premeditated frauds for another." *Poole*, 58 Tex. at 137-38; *Likover*, 696 S.W.2d at 472.

Nor does this Court's recent opinion in *Cantey Hanger* help Yollick. As noted above, *Cantey Hanger* does not apply at all here because the conduct at issue was unrelated to litigation. 2015 WL 3976267, at *3 n.6 (stating that the Court "need not consider the attorney-immunity doctrine's application to an attorney's

conduct that is unrelated to litigation . . . and 'requires the office, professional training, skill, and authority of an attorney.'" (citation omitted)).

But even if *Cantey Hanger* did apply (which it does not), the court of appeals correctly held that Yollick did not conclusively establish his immunity defense. This is because the court of appeals held, consistent with *Cantey Hanger*, that Yollick's conduct was outside the scope of his legal representation of FNB. As the court of appeals explained, "Yollick was not relying on his professional knowledge and training as an attorney to make a statement in the course of representing his client in an adversarial context; he was simply signing his name, acting as the Bank's agent with actual authority to bind his principal to a promise of future performance. The problem is that he knew the promise was false." *Yollick*, 447 S.W.3d at 469-70. Thus, even if the *Cantey Hanger* standard applied (which it does not), Yollick is still not entitled to immunity.

In short, if the attorney-immunity doctrine shields conduct like Yollick's— where an attorney masterminds a fraudulent scheme in which his spouse participates using a pseudonym and knowingly makes false statements in a business deal—there will simply be no limit to the immunity doctrine. A license to practice law will, in effect, be a license to commit fraud.

## II. THE COURT OF APPEALS CORRECTLY HELD THAT SUFFICIENT EVIDENCE SUPPORTED THE JURY'S VERDICT FINDING YOLLICK LIABLE FOR FRAUD.

Yollick signed the forbearance agreement on behalf of FNB knowing that neither he nor the bank had any intention of honoring it. With the ink barely dry, he orchestrated a stealthy scheme to divest Investors of their ownership of LTHM and the hospital system, flouting his earlier representations. There can be no dispute about Yollick's involvement in FNB's scheme—Yollick admitted that he helped FNB take LTHM from Investors. 4.RR.62.

A fraud cause of action requires a "material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of the truth, which was intended to be acted upon, which was relied upon, and which caused injury." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990). The evidence is legally and factually sufficient to support the jury's finding of fraud against Yollick.

In the face of overwhelming evidence that he was the ringmaster of the fraudulent scheme, Yollick claims that his status as FNB's agent shields him from liability for fraud he personally committed while serving FNB. Because his conduct as an agent constituted fraud in its own right, Yollick is liable to Investors on account of his own fraudulent conduct.

**A.     Corporate Agents Are Individually Liable For Fraudulent Acts Committed In The Service Of Their Principal.**

Yollick's brief goes to great pains to conflate and confuse the issue of his role as agent for FNB in the fraudulent scheme. He argues that parties to transactions "understand that the agent neither promises nor binds itself to any performance obligations" and that in this case, "no one thought Yollick would individually lend $3.5 million." Br. 27. He then goes on to cite various cases for the proposition that agents are not liable for breaches of contract by their disclosed principals. (*Id.*)

While agents are not liable for their principals' breach of contract, that standard does not absolve an agent like Yollick from his own *fraudulent* conduct that he commits while acting on his principal's behalf. "It is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative." *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 250-51 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *see also, e.g., Holberg v. Teal Constr. Co.*, 879 S.W.2d 358, 360 (Tex. App.—Houston [14th Dist.] 1994, no writ) (affirming fraud judgment against president of electrical subcontractor because evidence showed that he misrepresented that all suppliers had been paid); *Barclay v. Johnson*, 686 S.W.2d 334 (Tex. App.—Houston [1st Dist.] 1985, no writ) (holding that a corporate contractor's officer's signature on a brochure stating

that the contractor was a bonded builder and a member of a builders' association was a fraudulent statement, sufficient to support judgment against the officer as an individual); *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) (observing "Texas' longstanding rule that a corporate agent is personally liable for his own fraudulent or tortious acts").

In this case, Yollick was an admitted agent of FNB, CR.608; 5.RR.151, which the jury found—along with Yollick—liable for fraud.

The jury found Yollick liable for fraud after reviewing evidence of his fraudulent representations, in addition to his role in orchestrating the fraudulent scheme and creating the false documents that allowed the transactions to occur. And aside from any fraud committed on behalf of his client FNB, Yollick secured personal gain as his wife acquired control of a company worth more than $19 million, as well as a $10,000 cash payment.

Yollick cites *Chu v. Hong,* 249 S.W.3d 441 (Tex. 2008), to support his argument that liability should not be imposed on an attorney/agent like himself who drafts fraudulent transactional documents. Br. 30. But "*Chu* did not hold that attorneys are immune to suit for fraudulent acts undertaken in the representation of a client; it indicated exactly the opposite." *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 381 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Chu*, 249 S.W.3d at 446 & n.19).

In *Chu*, a third party buyer's attorney drew up a bill of sale of community property, a shop, at his client's request while knowing that one spouse was selling the shop without the other spouse's consent. 249 S.W.3d at 446. The seller had misrepresented to the third party buyer that "money from the sale would be used to pay off a loan from his parents, and the rest would be shared with" his spouse. *Id.* at 447. The spouse "denied there was any such loan, but there was no evidence" that the third party buyer or his attorney "knew that at that time." *Id.* In short, there was no direct or circumstantial evidence that the attorney agreed to the injury to be accomplished. *Id.* at 446-47. The court held that an "attorney who personally steals goods *or tells lies on a client's behalf may be liable for conversion or fraud* . . . But there are no such allegations here." *Id.* at 446 (emphasis added).

*Chu* thus presents a stark contrast to the facts here. As discussed more fully in the Statement of Facts and below, Yollick was the ringleader of the fraudulent scheme to divest Investors of their ownership interests; there was no evidence that the attorney in *Chu* had any knowledge of the fraud alleged there. Here, when Yollick signed transaction documents on behalf of his principal, he knew there was no intention to perform. In short, Yollick made false representations, even if the representations concerned the conduct of someone else (here, his principal).

Yollick warns of a parade of horribles where "[c]orporate officers and agents will be loath to sign contracts for their corporations if every signature exposes

55

them individually to potential tort and punitive-damages liability if the corporation later fails to perform." Br. 30. But that is not the circumstance here. In this case Yollick, a corporate agent, orchestrated a fraudulent scheme with his principal to steal from Investors, knowing that the representations he and his clients were making to Investors were false. That is a far cry from an innocent agent merely signing documents on behalf of a corporation that later fails to perform. As Yollick himself acknowledges, that agent would not be liable for the later breach of contract. But an agent that knowingly makes false statements on behalf of his principal can and is liable for the harm he causes.

As the court of appeals rightly observed, "[b]y signing the agreement on the Bank's behalf, Yollick made a material representation that the Bank intended to adhere to its terms. Because he did so *knowing that the Bank did not intend to perform* as promised, he can be held liable for his conduct, just as any other agent or corporate representative would be." Op. at 25-26 (citing *Miller*, 90 S.W.3d at 717 (Tex. 2002) ("[A] corporate agent is personally liable for his own fraudulent or tortious acts."); RESTATEMENT (SECOND) OF AGENCY §348 (1958) ("An agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by others is subject to liability in tort to the injured person although the fraud or duress occurs in a

56

transaction on behalf of the principal.") (cited with approval in *Miller*, 90 S.W.3d at 717 n. 29)).

The court of appeals did not, as Yollick contends, treat his signature as "his personal promise that his principal, the Bank, intended to perform . . . ." Br. 28. Rather, the court of appeals recognized that Yollick made false representations that he knew were false when he made them. Because of his individual, fraudulent conduct, Yollick must face the consequences of his actions.

**B.    There Is Overwhelming Evidence Supporting The Jury's Fraud Finding Against Yollick.**

The jury found Yollick individually liable for fraud. Courts "must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). Additionally, courts "do not step into the shoes of the fact finder because the fact finder is the only judge of the witnesses' credibility." *Moore*, 321 S.W.3d 727, 739 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Extensive evidence supports the jury's finding.

"A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). Specifically, "when one party enters into a contract with no intention of performing, that misrepresentation may

give rise to an action in fraud." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992). A breach of contract "combined with slight circumstantial evidence of fraud," is sufficient to support a finding of fraudulent intent. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006); *see also Aquaplex Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009).

## 1. Yollick made false material representations.

The forbearance agreement contained a number of material representations that Yollick knowingly made on behalf of FNB.

The agreement expressly referred to Investors as "members" of LTHM, recognizing their continuing ownership. DX4 ¶2 ("the members of LTHM . . . shall continue its efforts to raise additional equity or alternative funding sources"); *see also* 4.RR.183. It defined the forbearance period as lasting for at least 30 days from the date the funds were advanced. DX4 ¶1. Even after the forbearance period ended, FNB still had to take additional actions to transfer Investors' membership interests if the Investors did not secure financing. *See* DX4 ¶10.

LTHM's obligations to its members "arising under corporate governance documents shall in no way be deemed modified, altered, amended or extinguished by the terms" of the agreement. DX4 ¶8. The provision regarding an "orderly

58

transition" similarly contemplated that Investors would remain members during the forbearance period. DX4 ¶10.

Investors' voting rights were to be held in trust during the forbearance period. DX4 ¶7. LTHM, under the control of FNB and Merensky Reef, "shall" take no action "that would result in a material adverse effect upon the LTHM Group's value, operations, assets, members, governance or liabilities." DX4 ¶9 (emphasis added); *see also* 4.RR.182-83. And during the forbearance period, prior approval from "the Members" was required before LTHM made any business expenditure in excess of $20,000 outside the ordinary course of business. DX4 ¶12.

Yollick signed the forbearance agreement on behalf of FNB and participated in conference calls with Investors prior to its execution to discuss its provisions. DX4 at 4; 13.RR.91. As the court of appeals correctly explained, by signing the agreement on FNB's behalf, Yollick represented that FNB intended to perform the agreement. *Yollick*, 447 S.W.3d at 470.

That a corporate agent can be held personally liable for false statements he makes on behalf of his principal is nothing new under Texas law. In *Barclay v. Johnson*, 686 S.W.2d 334 (Tex. App. —Houston [1st Dist.] 1985, no writ), a corporate officer was held personally liable for fraud when he signed a brochure falsely stating that a corporate contractor was a bonded builder and a member of a builder's association:

Barclay's signature in the brochure was a false representation of a material fact, which the appellee relied upon to his detriment in signing the earnest money contract. This constituted personal participation in corporate wrongdoing sounding in tort. It was, therefore, sufficient to support a judgment against Barclay as an individual.

*Id.* at 338. Similarly, other courts have found that an agent's false statements of his principal's intent to perform were material misrepresentations that could support a fraudulent-inducement claim. *See Duval County Ranch Co. v. Wooldridge,* 667 S.W.2d 887, 894 (Tex. App.—Austin 1984, writ dismissed w.o.j.).

### 2. Yollick knew FNB had no intention of honoring the representations he made on its behalf.

As explained clearly in the court of appeals' opinion, there is ample evidence that (1) FNB never intended to honor its promises to hold the LTHM membership interests in trust and to not take actions that would have a materially adverse on Investors and (2) Yollick knew when he signed the forbearance agreement on FNB's behalf that FNB had no intention of abiding by it. *Yollick,* 447 S.W.3d at 461-62. As the court of appeals explained:

> [T]here is evidence that when Yollick represented that the Bank intended to perform, he knew that this was false because he already had witnessed Merensky Reef approving the plans to violate the agreement. Specifically, the record contains more than a scintilla of evidence that (a) Yollick and the Bank knew the terms of the Letter Agreement before Merensky Reef's board meeting on May 14, 2009; (b) at the same meeting, the board resolved both to execute the agreement and to take actions prohibited by the agreement; (c) Yollick was aware of these actions because they were performed in his presence and at his direction; and (d) Yollick did not represent that the

60

> Bank intended to comply with the agreement until after he had seen that these resolutions were passed.

447 S.W.3d at 462

"Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Because intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.* at 435 (finding intent where an employer refused to commit a bonus plan to writing and remained silent when asked if the plan would be approved after it had already been approved).

A party's "intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made." *Id.* at 434. Thus, in *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768 (Tex. 2009), the timing of a joint venturer's bankruptcy, filed just after the execution of a master settlement agreement with the managing venturer, constituted circumstantial evidence of a lack of intent to perform to support a finding of fraudulent intent. *Id.* at 774-75.

Here, the day before Yollick signed the forbearance agreement on FNB's behalf, he orchestrated a takeover of Investors' membership interests, in contravention of its provisions to hold the membership interests in trust and not take actions that had a material adverse effect on the Investors. PX3; PX4; PX5;

4.RR.161-62; 9.RR.77-79; 13.RR.213. On May 14, Yollick convened meetings for the newly-formed Merensky Reef at his law office, and, as shown in the minutes that he drafted, Merensky's directors promptly approved the execution of documents for the takeover of the Investors' ownership interests in LTHM in the very same meeting where they voted to execute the forbearance agreement that required them to hold the interests in trust and not take actions that would have a materially adverse effect on the Investors. PX3; PX4; PX5; 4.RR.161-62; 9.RR.77-79, 82-83; 13.RR.213, 248-49. The forbearance period had not yet expired; indeed, Merensky Reef had not yet even executed the forbearance agreement. *See* DX4; Exh. A to PX5.

That Yollick knew what Merensky Reef and the bank was up to is beyond doubt. Yollick invited three close contacts—including his wife who used a pseudonym and another longtime friend and client, neither of whom had any banking or hospital experience—to be Merensky Reef directors. 5.RR.155-56, 161; 6.RR.8; 8.RR.228-29; 13.RR.178, 190, 202, 243-44. Merensky Reef's new directors promptly approved executing loan documents to buy the hospital system. PX3; PX4; PX5; 9.RR.82-83; 13.RR.248-49. Yollick was present at the meetings and drafted the minutes. 8.RR.240, 246, 250; 8/6/12 Tr. at 22.

Despite the obligation of FNB and its agent, Merensky Reef, to hold the LTHM's membership interests in trust, the very next day, Merensky Reef

purchased the hospital system in a transaction financed by FNB and documented by Yollick. PX10; PX11; PX12; PX13; PX14; PX51; 11.RR.146-47; 15.RR.36-37; 194.

Yollick structured the loan to cover LTHM's outstanding indebtedness as well as an additional approximately $5.3 million of unrelated pre-bankruptcy debt that LTHM had not been obligated to pay. *See* PX10; PX11; PX12; PX13; PX14; PX15; PX51; 11.RR.146-47; 15.RR.32, 36-37, 194. All the real property of LTHM collateralized the loan. PX14; 15.RR.35-36.

FNB's vice president and chief lending officer conceded that the forbearance agreement did not provide FNB the "authority" to "take ownership of the collateral that was pledged by LTHM and the LTHM subsidiaries, the borrowers to the March 16, 2009, loan transaction" or to add another $5.3 million in debt, collateralized by the Houston hospital, as "an asset on [FNB's] books." 15.RR.27, 34, 39-40. Rossman, Merensky Reef's director, acknowledged that he could not think of "any business purpose that served the interests" of Merensky Reef "by taking on this additional 5 million dollars' worth of debt." 6.RR.29. He also acknowledged that "if the hospitals were sold during that 30-day forbearance period, that would be a breach" of the forbearance agreement. 5.RR.182.

Investors testified that Yollick's and FNB's actions "were essentially contrary to exactly what they just wrote a day before, that we go into this

agreement in good faith." 10.RR.195. Further, pursuant to the forbearance agreement, the voting interests could not be exercised "in a way that would materially damage our assets or our claims on our assets." 9.RR.226. Rather, "they have to hold [the voting rights] in trust and give it back when we come up with the funding." 13.RR.90. Nevertheless, "[i]mmediately the next day" after the forbearance agreement was executed, "the membership interests and the assets were taken from us." 10.RR.195; *see also* 9.RR.230-31.

Cementing the takeover of Investors' interests in the hospital system, Yollick drafted a Unanimous Consent, dated May 22, 2009, which expressly removed Investors from their positions in LTHM and confirmed Merensky Reef to be LTHM's "sole Member." PX18. Yollick served as counsel to Merensky Reef and advised its directors and shareholder in all their actions. *See* 8.RR.245, 247, 250; 9.RR.75, 99, 128-31; 13.RR.192, 221-24, 226, 244-45; 254-55. The directors and shareholder admitted that they did not have the proper knowledge and relied on Yollick to make their decisions. 8.RR.245, 247, 250; 9.RR.75, 99, 128-31; 13.RR.192, 221-24, 226, 244-45; 254-55.

Investors were blindsided by the transactions. Unbeknownst to them, FNB and Merensky Reef were "selling all our assets, selling all of our real estate—membership interests to themselves, and borrowing an extra $5.3 million." 4.RR.184-85. Investors' "understanding was they were going to hold our voting

rights in trust . . . as opposed to transferring our entire hospital and membership equity." 4.RR.177; *see also* 9.RR.230-31.

Investors received no communications regarding any expenditures in excess of $20,000, much less a sale of the entire hospital system. 4.RR.190. Investors "[a]bsolutely" did "not" ever have any intention of conveying their ownership in LTHM to Merensky Reef or FNB. 4.RR.196. Investors "[d]efinitely did not have any knowledge that this was going to happen." 10.RR.190; *see also* 4.RR.184-86; 9.RR.227.

That Yollick knew that FNB and its agent Merensky never intended to honor the promises in the letter agreement when he signed it is shown by overwhelming evidence. As noted above, Merensky's directors did what Yollick told them to do. Moreover, the fraudulent scheme was already underway. Yollick orchestrated the entire coup dé etat: signing the forbearance agreement, forming Merensky Reef and dictating its actions, installing his wife as a Merensky Reef director, and then directing the Merensky Reef directors to issue all of Merensky Reef's stock to the trust controlled by Tamara Yollick a/k/a Mara Drake. DX4 at 4; 4.RR.161-62; 8.RR.245; 9.RR.82-83, 163-65; 13.RR.91.

In fact, Yollick and his wife personally profited from the transactions. Mara Drake/Tamara Yollick received a $10,000 payment for serving as a Merensky Reef

officer or director. 9.RR.131; 13.RR.255-56. The bank's CFO testified that the bank's payment of this director fee to Yollick's wife was "unusual." 8.RR.93.

### 3. Investors relied on the misrepresentations.

Relying on Yollick's misrepresentations, Investors executed the forbearance agreement and diligently sought and secured outside funding in accordance with its provisions.

A party establishes reliance when evidence shows that it would not have taken a detrimental action but for having received the representation. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 931 (Tex. 1983) ("The record is replete with testimony that the Trenholms would not have purchased lots in Greenhollow if Ratcliff had not given them a satisfactory answer regarding the trailer park.").

All the Investors signed the forbearance agreement in reliance on the statements contained therein. PX6, 4.RR.193-94; 10.RR.112-13, 190-91, 195-96; 13.RR.91-94; *see also* 13.RR.91 (reliance on the provisions of the forbearance agreement as well as Yollick's representations regarding the agreement on the preceding conference call)).

Testimony showed that the "whole reason why" Investors executed the forbearance agreement and transferred their voting interests in trust was that they relied upon "the words that were set forth in that agreement." 10.RR.195-96. As the court of appeals recognized, this testimony alone was some evidence of

reliance of all of the Investors. *Yollick,* 447 S.W.3d at 463 (quoting the testimony at 10.RR.195-96 and stating that "testimony is some evidence that all of the Investors relied on Yollick's representation").

But there was additional evidence of reliance as well. Investors "trusted that" Yollick and FNB "would do what was set up to do in this term sheet." 10.RR.190-91. They would "[a]bsolutely not" have signed the forbearance agreement had they known that LTHM and the hospitals were going to be sold. 4.RR.185-86. Indeed, "[t]here is no way you would ever sign something like that." 9.RR.226-27.

In *Moore v. Altra Energy Technologies, Inc.*, 321 S.W.3d 727 (Tex. App.—Houston [14th Dist.] 2010, pet. denied), the court found reliance where the principal of a buyer of a business testified that he would not have signed the sales agreement with the business owner unless he had believed that the investor would finance the purchase as promised. *Id.* at 738-39; *see also Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 682 (Tex. 2000) ("In reliance on these representations, the plaintiffs agreed to accept spot market prices rather than a price tied in some manner to the Lone Star contract price.").

Upon executing the forbearance agreement, Investors proceeded to seek, and in fact did secure, short-term financing that would have fully satisfied the bridge loan. PX56; PX58; PX59; PX135; DX75; 4.RR.163-67, 178-80, 187, 194;

9.RR.228-29; 10.RR.193; 13.RR.100, 102-04; 15.RR.44-46, 48-49. That Investors performed their obligations under the agreement further shows their reliance.

Investors' "understanding was we were in good faith just going out to raise more money while they were holding our voting trusts." 4.RR.184-85; *see also* 9.RR.225. They reasoned that the forbearance agreement "allowed us to get some more working capital from the bank to run the hospitals while we, as investors, go out and bring some more money and—to pay this off and to continue to sustain the operations of the hospital." 13.RR.88. "Never in a million years did we expect them to do the things they did at all." 4.RR.171.

Investors also continued "talking to the physicians and working on the syndication efforts and placement of the physicians into the hospitals." PX135; DX75; 4.RR.163-64, 167, 178-79, 194; 13.RR.100, 104-05. But their efforts were for naught. Investors "were sincerely trying to get these hospitals going," but then, as Raja Talluri, the principal of appellant Priya Properties, LLC, explained, "suddenly we were told we no longer owned the hospitals anymore and the hospitals were taken away from our control." 13.RR.99; *see also* 13.RR.48.

In *Southwestern Bell Telephone Co. v. Marketing on Hold Inc.*, 308 S.W.3d 909 (Tex. 2010), this Court affirmed the trial court's finding that customers' payment of phone bills established proof of reliance upon the misrepresentations in the bills. The court explained that they "had no choice but to rely on the

misrepresentation." *Id.* at 922. In paying the amount of the bill, the customers "must have paid the total amount due, including the municipal fee." *Id.* Had they paid "a different amount, such as one that did not include the amount of the fee, Southwestern Bell certainly would have taken action, such as cancelling services." *Id.* at 922-23. Here, had Investors realized that their ownership in LTHM would be wrested in violation of the forbearance agreement, they would not have signed the agreement or diligently endeavored to secure financing in accordance with its provisions.

## III. YOLLICK'S DAMAGES ARGUMENT BEFORE THIS COURT WAS BARELY MENTIONED BY YOLLICK IN THE COURT OF APPEALS AND IS INCORRECT BECAUSE THERE IS AMPLE EVIDENCE OF INVESTOR'S DAMAGES.

In his second issue, Yollick claims that there is insufficient evidence of the value of Investors' membership interests because it was never calculated with all liabilities "in one complete calculation." Br. 10. Not only is Yollick's argument wholly incorrect because Investors' damages expert's uncontroverted testimony is sufficient to support the jury's finding, but it is almost unrecognizeable when compared to Yollick's arguments in the court of appeals.

### A. The Court Should Not Grant Yollick's Petition to Review His Damages Argument.

As Yollick notes, "[m]ost of the court of appeals opinion on damages focused on the evidence regarding LTHM's asset value." Br. 43. There was a very good reason for that. In the court of appeals, Yollick's argument that Investors'

damages evidence was insufficient focused on three points (1) it did not value the Investors' membership interests at all, (2) Investors improperly relied on the assets-minus-liabilities method, and (3) there was insufficient evidence to support the value of LTHM's assets. Yollick Appellee Br. 49-55.

Yollick now concedes that the court of appeals was right when it rejected points 2 and 3 and that the court of appeals was correct when it concluded that it was proper for Investors to rely on the assets-minus-liabilities method and there was sufficient evidence that LTHM's assets had a market value of $56 million. Br. 42-43. And he does not challenge the court of appeals's rejection of point 1. *Id*.

Instead, Yollick asks this court to reverse the court of appeals based on his incorrect assertion that Investors' expert failed to account for all of LTHM's liabilities in his damages opinion. Br. 10, 43. In the court of appeals, Yollick barely mentioned this point; his brief devoted only two sentences to this factual argument that is now his sole damages argument in this Court. Yollick Appellee Br. 53. Given that Yollick only devoted two sentences to this factual issue in the court of appeals, it is hard to imagine how the court of appeals committed "an error of law" that is "of such importance to the jurisprudence of the state" that "it requires correction." TEX. GOV'T CODE §22.001(a)(6).

**B. The Court of Appeals Correctly Held That There Was Sufficient Evidence of Investor's Damages.**

The sole element of damages the jury was asked to find in this case was "The value of each [Appellant's] membership interests in LTHM as of May 15, 2009." CR.611. The district court did not provide any instructions regarding how "value" was to be determined. *Id*. Because Yollick did not object to the form of the question nor did he request any instructions regarding how value was to be calculated, the sufficiency of the evidence is measured against the charge as given and the jurors were free to use the method and figures used by Investors' expert. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 & n. 30 (Tex. 2005); *Liberty Sign Co. v. Arendale*, 433 S.W.2d 23, 26-27 (Tex. Civ. App.—Fort Worth 1968, no writ) (appellant waived complaint about the method used by jurors to calculate "reasonable cash market value" where appellant neither requested any definition or instruction about how it was to be calculated nor objected to the absence of any definition or instruction, and the only number jurors used that was not supported by the evidence benefitted the appellant).[4]

---

[4] Contrary to what Yollick suggests in his brief, Br. 48, he did not make any objection at the charge conference regarding the evidence of LTHM's liabilities. The record cite Yollick provides is to FNB's and Merensky Reef's objections. 17.RR.18; *see also* 17.RR.17 (counsel noting that she was speaking only for FNB and Merensky Reef). Yollick separately objected to the charge and just made a general one-sentence no evidence objection without any explanation. 17.RR.28.

At trial, Investors' called Gilbert Herrera as their damages expert. Yollick does not dispute that Herrera's qualifications. This is unsurprising given his extensive experience in the operation of regulated financial institutions and healthcare institutions as well as valuing hospitals and other healthcare businesses. 14.RR.8-11, 13-19. Herrera has worked as a bank loan officer, supervised the lending activities of Amegy and Sterling Banks, and served as the chair for Christus Health's board of directors, which is required by law to value each of the system's assets annually. 14.RR.9-10, 13-14, 17-19.

Herrera testified that "that the value of the Investors' membership interests was equal to the value of [LTHM's] assets minus the amount of the lien." *Yollick*, 447 S.W.3d at 467; *see also* 14.RR.35-36. Yollick and his co-defendants did not call any fact or witness that suggested this method was not correct. In fact, Yollick and his co-defendants did not call any witnesses at all during the liability/damages portion of trial. 17.RR.13; 18 RR.36.

As Yollick concedes, there was evidence that LTHM's assets had a market value of $56,147,000. This concession is unsurprising given that FNB itself valued the collateral in that amount and, just a few months after FNB wrongfully took LTHM from Investors, they sold LTHM's subsidiaries (i.e., the hospitals) for $55,400,000. PX26-34, 51, 195; 11.RR.120-124; 14.RR.34. Investors' expert further testified that LTHM's liabilities were $37,041,000. 14.RR.35-36. Thus,

72

Investors' expert concluded that LTHM's total membership interests were worth $19,106,000 and that each member's interest would be worth the total value of LTHM multiplied by their percentage ownership interest. 14.RR.35-40.

Nevertheless, despite the fact the court of appeals stated correctly that Investors' expert testified about LTHM's liabilities, *Yollick*, 447 S.W.3d at 467 n.7, Yollick tries to dress up his quibbles with the evidence of liabilities as an argument that Investors' expert, Gilbert Herrera, either failed to consider data regarding other LTHM liabilities or that he ignored other LTHM liabilities. Yollick Br. 46. But this is simply not the case.

As this Court explained in *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 833 (Tex. 2014), when there is conflicting evidence regarding an expert's factual assumptions, it is the province of the jury to determine whether to credit the expert's opinion and the premises on which it is based. *Id*. Only when an expert's assumptions "are contrary to conclusively proven facts" or if the assumption is unsupported by any evidence is an expert's opinion legally insufficient to support a damages award. *Id.*

Here, Yollick does not dispute that LTHM owed FNB $37,041,000. Rather, Yollick claims that there were some other unidentified liabilities that Herrera failed to take into account. But while Yollick expounds at length about the financial difficulties LTHM faced in the first three months after it bought the hospitals out

73

of bankruptcy, there is no evidence of any bill or expense that LTHM had failed to pay or owed as of May 15, 2009 or any other indebtedness. Simply put, there is no evidence (let alone undisputed evidence) of any LTHM liabilities that Herrera failed to take into account.

First, contrary to Yollick's suggestion that Herrera only looked at one liability among others, Herrera in fact testified that he considered "nine or ten" different LTHM liabilities. 14.RR.137. And Herrera specifically explained why certain tax liens were not liabilities of LTHM, but were LTHM assets because LTHM had bought the liens, and how he had taken this into account in his analysis. 14.RR.44-45.

Second, Yollick is incorrect when he says it is undisputed that LTHM had liabilities other than what it owed FNB. In fact, Herrera said he was not aware of any other liabilities beyond the ones he had identified, 14.RR.137, and there is no evidence of any other LTHM liability.

It is true that from March 16, 2009, when LTHM bought the hospitals until May 15, 2009, when Yollick and FNB wrongfully took LTHM from the Investors, that LTHM's expenses exceeded its operating revenue. 5.RR.126. But what Yollick leaves out is that LTHM had other means to pay its bills besides operating revenue. The original $37 million loan included approximately $5 million for LTHM to use to retire prior tax debts of LTHM's (which it did) and to provide

74

working capital until LTHM could cover its expenses through operating revenue. 4.RR.102-04. Plus, the Investors themselves put their own money into LTHM to help it cover its expenses. 10.RR.57. A business can be losing money because its costs exceed its revenue but still pay its bills on time.

Moreover, when LTHM bought the hospitals in March 2009, it used several million dollars of the loan proceeds to retire its liabilities. In particular, it used over $3 million to purchase outright hospital equipment that had previously been leased and used another $2 million to pay off outstanding tax liabilities. 11.RR.177-79 (equipment leases); 11.RR.179-80 (taxes). Thus, on May 15, 2009, which is the relevant date for valuing the LTHM membership interests according to the jury charge, these liabilities no longer existed. They had been paid off with proceeds from the $37 million in loans from FNB.

While Yollick states that LTHM was burdened with "operational liabilities," Br. 47. there is no evidence of any such liabilities and the cites Yollick provides do not reflect any such liabilities. For example, while Investors were concerned about their ability to make payroll on May 15 and in the future, 9.RR.215-20, the fact is that LTHM did make payroll on time up until the day LTHM was taken from them. 9.RR.217. So, contrary to Yollick's suggestion that LTHM had a $2.5 million

payroll liability, Br. 46, the evidence showed that LTHM was able to make payroll.[5]

Similarly, LTHM paid the bills submitted by the outside consultant that Yollick and FNB imposed on them. 6.RR.24. Similarly, Yollick cites the testimony of Greg Walker at 4.RR.222-24 to suggest the hospitals were losing money. But Walker's testimony at these pages referred to the hospitals debts owed before the bankruptcy by the prior owners. *Id*.

The only other purported liability Yollick claims that Herrera failed to consider are additional loans FNB made on May 15, 2009 at the same time as the forbearance agreement at issue in this case. Br. 45. But what Yollick fails to mention was that LTHM was not the borrower of these loans. These loans were made to the bank's agent, Merensky Reef. PX51; 11.RR.122-23. Thus, there is no reason why Herrera would consider loans made to Merensky Reef to be liabilities of LTHM.

Thus, while it is true that finances were tight at LTHM through May 15, 2009 and that Investors were concerned about its ability to cover payroll in the future, there is not one shred of evidence of that LTHM had any outstanding liabilities on May 15, 2009 other than what it owed FNB.

---

[5] Yollick also notes that on May 14, 2009, LTHM thought it would need $6-8 million to get through the next three months. Br. 46. But there is no evidence that this anticipated future need was in any way related to existing liabilities on May 15 as to possible future obligations. 10.RR.89.

Finally, Yollick's brief oddly insists that Investors' evidence failed to provide "one complete calculation" of damages. Br. 24. But this requirement is a rule governing  lost-profits calculations, *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992), which were not at issue in this case. The "one complete calculation" requirement is specific to a lost profits calculation and simply recognizes that in calculating lost profits, it is not enough to use "pieces of several different methods of calculating lost profits." *Holt*, 835 S.W.2d at 85. That did not occur here. Rather, the jury calculated Investors' damages by deducting liabilities from assets, a formula Yollick now concedes is appropriate.

## IV. THERE IS LEGALLY SUFFICIENT EVIDENCE TO SUPPORT THE PUNITIVE DAMAGES AWARD.

Finally, Yollick argues that the evidence was legally insufficient to support the jury's unanimous finding that clear and convincing evidence established that injuries suffered by Investors were due to Yollick's fraudulent or malicious conduct.

With respect to fraud, Yollick simply reasserts that he did not commit any tort at all. He incorrectly asserts that he "has been held liable by the court of appeals merely for signing [sic] the contract as agent for his principal." Br. 53. To the contrary, the court of appeals found the evidence sufficient to conclude that he committed fraud, finding "Yollick knew the Bank never intended to comply with the Letter Agreement's terms", that "there is evidence that when Yollick

represented that the Bank intended to perform, he knew this was false because he already had witnessed Merensky Reef approving the plans to violate the agreement", that "there is more than a scintilla of evidence that Yollick witnessed the board's actions and even directed them", that "[t]he Letter Agreement bearing his signature is evidence that despite this knowledge, he nevertheless represented that the Bank intended to be bound by the agreement", and "the evidence is more than sufficient to show that when Yollick represented that the Bank intended to comply with the Letter Agreement, he knew that representation was false." Op. 12-14.[6] Investors have explained at length in this brief that there was extensive evidence that supported the jury's finding that Yollick did commit fraud.

Additionally, there was extensive evidence of Yollick's malice. As explained above, Yollick quarterbacked the defendants' scheme to steal LTHM from Investors and then strip LTHM of its assets (which FNB did within six months for over $55 million). This conduct is the epitome of the statutory definition of malice: a "specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE §41.001(7). And Texas

---

[6] Yollick's suggestion that Investors' settlement with FNB and Merensky Reef somehow prevent the court of appeals from considering the issues of whether they breached the agreement and whether they never intended to perform is misleading and false. Yollick briefed those very issues in the court of appeals. Yollick Appellee Br. 36-44; *see id.* at 33 ("II. There was no evidence of non-performance of the contract, much less proof of a fraudulent intent not to perform."); *id.* at 36 ("B. FNB and [Merensky Reef] Complied with the Forbearance Agreement." And the court of appeals devoted an entire section of its opinion to these very issues. *Yollick*, 447 S.W.3d at 460 ("2. There is legally sufficient evidence that the representation was false because the Bank never intended to comply with the agreements' terms").

law has long held that intentionally taking the property of another through wrongful means meets this standard. *Bennett v. Reynolds*, 315 S.W.3d 867, 872 (Tex. 2010); *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, 403 S.W.3d 360, 369 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Bright v. Addison*, 171 S.W.3d 588, 598 (Tex. App.—Dallas 2005, pet. denied).

## CONCLUSION AND PRAYER

For the foregoing reasons, Yollick's petition for review should be denied. Should the Court grant Yollick's petition, the Court should affirm the judgment of the court of appeals. Respondents pray for all other relief to which they are entitled.

Respectfully submitted,

/s/ Marc S. Tabolsky

| | |
|---|---|
| R. Michael McCauley Jr. | Marc S. Tabolsky |
| State Bar No. 00797030 | State Bar No. 24037576 |
| Timothy T. Pridmore | mtabolsky@yettercoleman.com |
| State Bar No. 00788224 | Dori Kornfeld Goldman |
| MCWHORTER, COBB & JOHNSON, L.L.P. | State Bar No. 24041274 |
| | dgoldman@yettercoleman.com |
| 1722 Broadway | YETTER COLEMAN LLP |
| Lubbock, Texas 79408 | 909 Fannin Street, Suite 3600 |
| Tel. 806-762-0214 | Houston, Texas 77010 |
| Fax 806-762-8014 | Tel. 713-632-8000 |
| | Fax 713-632-8002 |
| | |
| Zona Jones | Patrick Zummo |
| State Bar No. 10887600 | State Bar No. 22293450 |
| PROVOST UMPHREY LAW FIRM, LLP | LAW OFFICES OF PATRICK ZUMMO |
| P.O. Box 4905 | 909 Fannin, Suite 3500 |
| Beaumont, Texas 77704 | Houston, Texas 77027 |
| Tel. 409-835-6000 | Tel. 713-651-0590 |
| Fax 409-813-8618 | Fax 713-651-0597 |
| | |
| | ATTORNEYS FOR RESPONDENTS |

80

**CERTIFICATE OF COMPLIANCE UNDER APPELLATE RULE 9.4**

I certify that this brief complies with the type-volume limitation of Texas rule of Appellate Procedure 9.4(i)(2) because it contains 14,702 words, excluding the parts of the briefs exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/Marc S. Tabolsky
Marc S. Tabolsky

## CERTIFICATE OF SERVICE

On August 20, 2015, I electronically filed this Respondents' Brief on the Merits with the Clerk of Court using the Court's electronic filing system which will send notification of such filing to the following lead counsel for Petitioner.

Roger D. Townsend
rtownsend@adjtlaw.com
Jennifer R. Josephson
jjosephson@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON
 & TOWNSEND LLP
1844 Harvard Street
Houston, Texas 77008
Telephone: (713) 523-2358
Facsimile: (713) 522-4553

Kristin Bays
kristin@baysandbays.com
J. Randal Bays
randy@baysandbays.com
BAYS & BAYS
1503 Hailey
Conroe, Texas 77301
Telephone: (936) 760-7670
Facsimile: (936) 760-7671

/s/Marc S. Tabolsky
Marc S. Tabolsky